-i-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| POM OF PENNSYLVANIA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>PYRAMID TECHNOLOGIES, INC.,<br><br>Defendant. | Civil Action No. 2:23-cv-04348-JMY<br><br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW OF DEFENDANT PYRAMID TECHNOLOGIES, INC.
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

-i-

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................... 1

II.   BACKGROUND ................................................................................ 3

      A.   POM and Pyramid Devices.................................................................. 3

      B.   POM's Vetting of Pyramid 's Printer ................................................... 4

III.  ARGUMENT ..................................................................................... 6

      A.   POM Lacks Standing Because It Was Not Injured, and Therefore,
           POM's Claims Must Be Dismissed. ...................................................... 8

           1.   Federal Rule of Civil Procedure 12(b)(1) ................................... 8

           2.   POM has alleged harm in a conclusory manner that is
                belied by the clear security benefits conferred by use of
                the Printer and Sentry. .............................................................. 9

      B.   POM's CFAA Claims Must be Dismissed Because the
           Allegations Fail to Satisfy the CFAA's Requisite Elements. ........................... 13

           1.   Federal Rule of Civil Procedure 12(b)(6) ................................... 13

           2.   Key Statutory Definitions of the CFAA. ................................... 14

           3.   POM Has Failed to Show That the POM Game Is a
                "Protected Computer."............................................................. 15

           4.   There Was No "Access" Here. ................................................. 16

           5.   Even If "Access" Occurred, It Was Authorized. ................................. 17

           6.   POM's CFAA Theories Fail Because POM Has Not
                Suffered Damages.................................................................. 19

           7.   POM's CFAA Theories Fail Because the CFAA Does Not
                Address the Activity Alleged................................................... 20

      C.   POM's Pennsylvania State Claims Are Deficient and Should Be
           Dismissed............................................................................... 22

           1.   The Spyware Act Claim (Count III) Fails Because It Does
                Not Apply to the Facts as Alleged in the Complaint. ......................... 22

           2.   POM's Pennsylvania State Law Claim Regarding
                Misappropriation and Misuse of Confidential Information
                (Count II) Similarly Fails......................................................... 24

      D.   ████████████████████████████████████
           ████████████████████████████████████



IV.      CONCLUSION                         30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAMCO Transmissions, Inc. v. Romano*,
   42 F. Supp. 3d 700 (E.D. Pa. 2014) ................................................................................. 26, 27

*Advantage Ambulance Grp., Inc. v. Lugo*,
   No. 08-3300, 2009 WL 839085 (E.D. Pa. Mar. 23, 2009) ...................................................... 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................................. 13, 25

*AtPac, Inc. v. Aptitude Sols., Inc.*,
   No. CIV. 2:10-294, 2010 WL 1779901 (E.D. Cal. Apr. 29, 2010) ........................................ 18

*Becker v. Toca*,
   No. 07-7202, 2008 WL 4443050 (E.D. La. Sept. 24, 2008) ................................................... 16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................................... 13

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006) ................................................................................................. 29, 30

*Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*,
   No. CV 16-2499, 2017 WL 1105648 (E.D. Pa. Mar. 24, 2017) .............................................. 14

*Brett Senior & Assocs., P.C. v. Fitzgerald*,
   No. CIV.A. 06-1412, 2007 WL 2043377 (E.D. Pa. July 13, 2007) .................................. 15, 19

*Churchill Corp. v. Third Century, Inc.*,
   578 A.2d 532 (Pa. Super. Ct. 1990) .......................................................................................... 29

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ....................................................................................................................... 8

*D'Orazio v. Hartford Ins.*,
   No. CIV. A. 09-CV-403, 2009 WL 1812790 (E.D. Pa. June 23, 2009) .............................. 29, 30

*Dresser-Rand Co. v. Jones*,
   957 F. Supp. 2d 610 (E.D. Pa. 2013) ..................................................................................... 21, 22

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ........................................................................................................................ 28

*Finello v. Foster Wheeler LLC*,
   No. 18-CV-3584, 2023 WL 5002850 (E.D. Pa. Aug. 4, 2023) ............................................. 8, 9

*First Fin. Mgmt. Grp., Inc. v. Univ. Painters of Balt., Inc.*,
   No. CIV.A. 11-5821, 2012 WL 1150131 (E.D. Pa. Apr. 5, 2012) ...................................... 26, 27

*Foster v. Chesapeake Ins.*,
    933 F.2d 1207 (3d Cir. 1991)..................................................................................................... 28

*Gap Props., LLC v. Cairo*,
    No. CV1920117KMESK, 2021 WL 5757410 (D.N.J. Dec. 3, 2021) ..................................... 15

*Gay v. CreditInform*,
    511 F.3d 369 (3d Cir. 2007)...................................................................................................... 29

*Glendening v. Fair Acres Geriatric Ctr.*,
    No. 19-CV-01167, 2019 WL 5550977 (E.D. Pa. Oct. 28, 2019) .............................................. 5

*Grisafi v. Sony Elecs. Inc.*,
    No. 18-8494 (JMV) (JBC), 2019 WL 1930756 (D.N.J. Apr. 30, 2019)................................... 16

*Hugel v. Corp. of Lloyd's*,
    999 F.2d 206 (7th Cir. 1993) ................................................................................................... 27

*In Re BPS Direct LLC & Cabela's LLC Wiretapping*,
    No. 22-CV-4709, 2023 WL 8458245 (E.D. Pa. Dec. 5, 2023)................................................. 10

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)..................................................................................................... 5

*Jordan v. SEI Corp*,
    No. CIV. A. 96-1616, 1996 WL 296540 (E.D. Pa. June 4, 1996).......................................... 27

*Kost v. Kozakiewicz*,
    1 F.3d 176 (3d Cir. 1993) ................................................................................................. 11, 13

*Medina v. City of Philadelphia*,
    219 F. App'x 169 (3d Cir. 2007) ............................................................................................... 9

*Merritt Hawkins & Assocs., LLC v. Gresham*,
    948 F. Supp. 2d 671 (N.D. Tex. 2013) ................................................................................... 16

*Multiven, Inc. v. Cisco Systems, Inc.*,
    2010 WL 2889262 (N.D. Cal. July 20, 2010).......................................................................... 16

*National City Bank, N.A. v. Prime Lending, Inc.*,
    2010 WL 2854247 (E.D. Wash. July 19, 2010)....................................................................... 16

*Oce N. Am., Inc. v. MCS Servs., Inc.*,
    748 F. Supp. 2d 481 (D. Md. 2010)................................................................................... 17, 18

*P.C. Yonkers, Inc. v. Celebrations The Party & Seasonal Superstore, LLC*,
    428 F.3d 504 (3d Cir. 2005)...................................................................................................... 21

*Paradigm All., Inc. v. Celeritas Techs., LLC*,
    248 F.R.D. 598 (D. Kan. 2008).................................................................................................. 16

*Pen-Del Mortg. Assocs. v. F.D.I.C.*,
    No. CIV. A. 94-0067, 1995 WL 27516 (E.D. Pa. Jan. 20, 1995)............................................. 8

*QVC, Inc. v. Resultly, LLC*,
    159 F. Supp. 3d 576 (E.D. Pa. 2016) ................................................................ 15

*SecureInfo Corp. v. Telos Corp.*,
    387 F. Supp. 2d 593 (E.D. Va. 2005) ................................................................ 18

*Simmonds Equip., LLC v. GGR Int'l, Inc.*,
    126 F. Supp. 3d 855 (S.D. Tex. 2015) ................................................................ 16

*Smith v. Commonwealth Nat'l Bank*,
    557 A.2d 775 (Pa. Super. Ct. 1989) ................................................................ 28

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ................................................................ 9, 10

*Tatis v. Allied Interstate, LLC*,
    882 F.3d 422 (3d Cir. 2018) ................................................................ 13

*Teva Pharms. USA, Inc. v. Sandhu*,
    291 F. Supp. 3d 659 (E.D. Pa. 2018) ................................................... 14, 15, 21, 24

*Thomas-Brady v. Liberty Mut. Fire Ins.*,
    No. CIV.A. 11-2281, 2011 WL 6150643 (E.D. Pa. Dec. 12, 2011) ....................................... 28

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................ 9, 12

*United States v. Drew*,
    259 F.R.D. 449 (C.D. Cal. 2009) ................................................................ 16

*United Fed'n of Churches, LLC v. Johnson*,
    598 F. Supp. 3d 1084 (W.D. Wash. 2022) ................................................................ 18

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966) ................................................................ 28

*United States v. Fowler*,
    No. 8:10-CR-65-T-24AEP, 2010 WL 4269618 (M.D. Fla. Oct. 25, 2010) ................................. 16

*United States v. Roque*,
    No. 12-540, 2013 WL 2474686 (D.N.J. June 6, 2013) ................................................ 16

*United States v. Trotter*,
    478 F.3d 918 (8th Cir. 2007) ................................................................ 16

*United States v. Yücel*,
    97 F. Supp. 3d 413 (S.D.N.Y. 2015) ................................................................ 15

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) ................................................................ 20

**Statutes**

18 U.S.C. § 1030(a)(2)........................................................................................... 14, 15, 20

18 U.S.C. § 1030(a)(4).............................................................................................. 14, 15

18 U.S.C. § 1030(e)(2).................................................................................................... 15

18 U.S.C. § 1030(e)(2)(B) ....................................................................................... 14, 15

18 U.S.C. § 1030(e)(6)................................................................................................... 14

28 U.S.C. § 1367(c) ......................................................................................................... 8

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ................................................................... 8, 9

Federal Rule of Civil Procedure 12(b)(6) ............................................................ 9, 13, 25

Federal Rule of Civil Procedure 12(h)(3) ....................................................................... 8

**Other Authorities**

Restatement (Second) Conflict of Laws § 187 (1971)..................................................... 28

Pennsylvania House Committee on Appropriations, S.B. 123 (Sept. 29, 2010) .......................... 23

Pennsylvania Senate Appropriations Committee Fiscal Note, S.B. 123 (Mar. 31, 2009) ............ 23

## I.      Introduction

Defendant Pyramid Technologies, Inc. ("Pyramid") hereby moves to dismiss the Complaint filed by Plaintiff, POM of Pennsylvania, LLC ("POM").

POM's unavailing lawsuit is apparently an effort to corner the gaming industry market in the Commonwealth of Pennsylvania by using the federal courts to attack a supplier, Pyramid. As explained below, POM installed Pyramid's Phoenix printer (the "Printer") for use as a component part of a game of skill it developed (the "POM Game") that is played in Pennsylvania, among other places. Complaint ("Compl.") ¶¶ 10-13. The Printer is a necessary part of the POM Game because it enables payout data from the game to be printed on a ticket. *Id.* Owners of locations where POM Game units are used (typically owners of gaming establishments, such as convenience stores), need the ticket in order to provide users with purported winnings. Compl. ¶¶ 14-16. Critically, the information printed on the tickets is public and available to anyone in a gaming establishment within vicinity of the POM Game, especially as the tickets state the payout information with the winning amounts. *See* Compl. ¶ 15 (noting that the cash amount is printed on the ticket itself).

Pyramid also markets software and a software tablet (the Sentry Security Module, also known as "Sentry"). *See* Compl. ¶¶ 20-21 (incorrectly asserting that the Sentry is "TRT software"). The Sentry is designed to validate payout information printed on the ticket produced from gaming devices, including the POM Game). *Id.* Via one-way communication, the POM Game tells the Printer what to print. In turn, the Printer prints the ticket, then the ticket is read by an attendant or a Ticket Redemption Terminal ("TRT") for a cash payout.  Sentry allows printing of the QR Code, and the Sentry software allows customers to decrypt that QR code using the tablet or the TRT Sentry is designed to interact with the POM Game, as well as other gaming devices produced by other manufacturers. Compl. ¶ 23. This, and not POM's baseless legal claims, is what apparently underlies the present lawsuit. Compl. ¶ 24 ("This compatibility is the genesis of the instant action.").

Based upon the above facts, POM's complaint asserts that Pyramid purportedly: (1) violated the Computer Fraud and Abuse Act ("CFAA") (Count I); (2) misappropriated and misused confidential business information (Count II); and (3) violated the Pennsylvania Consumer Protection Against Computer Spyware Act (the "Spyware Act") (Count III). Compl. ¶¶ 41-69. Inexplicably, the crux of POM's far-ranging allegations is that Pyramid improperly accessed and used payout data from the POM Game. Compl. ¶¶ 45-46, 55-56, 65. Not so. The allegations make little sense because the payout data, confirmation of the amount of winnings and the device from which an amount is won, is publicly available to anyone within a gaming establishment at the time of play. *See* Compl. ¶ 15 (noting that the cash amount is printed on the ticket itself). Moreover, the communication between the POM Game and the Printer is one-way: the POM Game tells the Printer what to print.

Evidently, what actually concerns POM is the fact that third-party TRTs are able to integrate with Sentry, which may be used to read information from the Printers that are compatible with POM Games, as well as other gaming devices marketed by POM's competitors. Compl. ¶¶ 24-26. POM is presumably offended by this interoperability, which threatens POM's market share in Pennsylvania because the Printer and Sentry devices can be used with various games of skill, and not merely the POM Game. And because there is nothing per se illegal about such interoperability, nor with a competitive marketplace, POM has apparently cobbled together this lawsuit. POM's improper claims that Pyramid has accessed "confidential" information, and POM's grasping efforts to invoke esoteric privacy laws relating to spyware and "computer" fraud, are unwarranted. As explained in greater detail below, POM's allegations are fatally deficient for three basic reasons:

1.  POM lacks standing because it has not been injured by Pyramid, whose technology actually facilitates use of the POM Game by POM's customers;

2.  The Printer relies on information provided via one way communication from the POM Game to the Printer, solely directing the cash-out data printed, therefore any "access" is not unauthorized for purposes of the CFAA; and

3.      this lawsuit does not concern information that is confidential.

In the alternative, if the Court concludes that this lawsuit concerns confidential information, a contention that Pyramid vigorously contests, this action is governed by choice of venue and law provisions that require dismissal.

## II.      Background

### A.      POM and Pyramid Devices

Pyramid manufactures thermal printers and machines to accept, validate, and capture bill payments. These machines are used throughout the country in various contexts, wherever a ticket needs to be printed or validated, such as in gaming and amusement centers. POM alleges that it uses Pyramid's printers as a component of tens of thousands of POM's games of skill, such as the POM Game. Compl. ¶ 13. The POM Game incorporates the Printer as a necessary component of the gaming unit. Compl.  ¶¶ 10-13.

The POM Game and Printer work in tandem to offer gaming services as follows. The owner of a location where a POM Game is used, such as a convenience store owner or bar proprietor, places one or more of the POM Games at a publicly-accessible establishment that features games of skill. *See* Compl. ¶¶ 14-17. Individual members of the public then play on the POM Game, as well as possibly other games of skill produced by POM's competitors, to win cash prizes. *See* Compl. ¶¶ 21-22.

When a player wins a cash prize on the POM Game, the Printer prints a ticket with the payout information, such as the amount of the cash prize, readable on the ticket's face. Compl. ¶ 15. A player can redeem the ticket for a cash payout either at a cash register in the gaming establishment or through a TRT, a device that Pyramid does not produce. Comp. ¶¶ 14-16; *see also* Compl. ¶ 18 (noting that POM does not manufacture TRTs purportedly authorized for use with the POM Game).

TRTs review payout information on the ticket's face and issue a cash prize. Compl. ¶¶ 16-18. Critically, the information on the ticket, including the payout, is public and decidedly not confidential. A gaming establishment owner and the establishment's customers would know

about the size of the payout, and which games resulted in the payouts, as parties to that transaction. Anyone with access to the ticket, such as a cash register attendant, would likewise have this information.

Another component in the payout chain is the Sentry, a link between tickets and TRTs. *See* Compl. ¶¶ 20-21 (incorrectly labeling Sentry as "TRT software"). Gaming establishment operators face a significant question when a customer presents a ticket for payment: Is the ticket valid and not a counterfeit? The operators are obligated to pay cash prizes, and, naturally, the operators therefore want to authenticate tickets as valid before money is paid out.

Pyramid fulfills this important need through Sentry. *See* Compl. ¶¶ 20-21 (identifying that Pyramid designed Sentry to read vouchers for the benefit of establishment operators potentially using POM and non-POM machines). Sentry, developed and provided by Pyramid, is compatible with game tickets generated by the Printer. Compl. ¶ 23. When paired with a Printer, Sentry instructs the Printer to print an additional "QR" code on the ticket that the establishment owner can use to verify that the ticket is valid so that payment can be made. *See* Compl. ¶ 28. Thus, Sentry helps gaming establishment operators identify and confirm (i) the location from which tickets were obtained, (ii) whether the tickets are duplicates, and (iii) whether the tickets are otherwise valid (i.e., not forged) and should be paid out. Using Sentry, a gaming establishment's operator may quickly scan a payout ticket in order to obtain real-time confirmation as to whether cash should be provided to a consumer by decrypting the QR code. Sentry is designed to validate ticket information from various game devices, including tickets from POM Games that utilize the Printer, as well as games from other manufacturers. *See* Compl. ¶¶ 21-24. This broad interoperability, which presumably encourages competition in the marketplace because the Printer and Sentry may be used with non-POM games, apparently offends POM and resulted in this lawsuit. *See* Compl. ¶¶ 24-26.

B.      **POM's Vetting of Pyramid 's Printer**

When it developed the POM Game, POM surely understood how the Printer and Sentry interacted with the POM Game, which depends upon the Printer as an integral component of the

gaming unit. Compl. ¶ 13. As stated above, the Printer is necessary to generate the ticket a winning customer who uses the POM Game redeems for cash. Compl. ¶ 14-16.

By necessity, the POM Game must send information to the Printer to convey the material to be printed. *See* Compl. ¶¶ 13-16. The POM Game determines what data is transmitted to the Printer, and this data is necessary for the printer to print a voucher securely than can be redeemed by an attendant at the location or at a separate TRT. *Id.* This communication flows one way: from the POM Game to the Printer to print the ticket.

Given that the Printer is incorporated as a component into "tens of thousands of POM Games" in Pennsylvania and elsewhere, it is to be expected that POM would have thoroughly understood how the Printer operates, and that the Printer operates with the POM Game as expected. *See* Compl. ¶¶ 10-13.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ a Non-Disclosure Agreement ("NDA") █████████████

████████████████ Declaration of Barak Cohen ("Cohen Decl."), Ex. A ¶ 1.[1] ███████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[1] Pyramid has filed a Motion requesting to file the NDA under seal and that portions of this Memorandum be redacted from the public docket. *See* Local Civil Rule 5.1.5(a) (generally requiring court order to file under seal in absence of statute requiring a sealed filing). ████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

### III.    Argument

 POM's Complaint sets out three causes of action: (1) violation of the CFAA; (2) misappropriation and misuse of confidential business information; and (3) violation of the Spyware Act. Each of these claims are baseless and unwarranted as a matter of law, and they cannot survive a Motion to Dismiss.

*First*, POM has not suffered any injury, and therefore lacks standing. Nowhere does the Complaint detail a basis for alleged damages. To the contrary, the Printer and Sentry add to the appeal of the POM Game by helping operators of the POM Game ensure prize ticket authenticity. POM claims, without any basis, that it has suffered damages of at least $5,000, Compl. ¶ 47, and possibly more than $150,000. Designation Form (ECF No. 1-2) at 1. Contrary to these conclusory and unsupported assertions, POM has suffered no damages. POM claims that its damages are a result of "harm to POM's data, loss of sales of POM-approved TRT, and costs of investigation and remediation[.]" Compl. ¶ 47. These alleged damages are illusory. As explained below, POM's data was not accessed or lost. Nor has POM explained how a "loss of sales of POM-approved TRT" relates to this lawsuit, since nowhere in the Complaint does POM allege that it marketed TRTs or profited from use of TRTs. Costs of remediation are not appropriate because there is nothing to remediate; the Printer works as intended. Without a concrete injury, POM is without standing to pursue this lawsuit.

*Second*, POM fails to meet the required elements of its CFAA cause of action (Count I) because Pyramid does not access the POM Game. Nor can it be said that any data the Printer or Sentry *receives* is not authorized. The POM Game directs information to the Printer in one direction only, and the POM Game necessarily authorizes the transfer of this data, which is a

-6-

fundamental part of the game's operation. In addition, Sentry does not come packaged with a POM Game unit. Instead, POM Game operators are responsible for purchasing the Sentry module. The operator of the game unit's location is therefore authorizing Sentry to operate with the Printer or TRT.

*Third,* the information allegedly at issue is not confidential. POM fails to adequately identify or plead any information of a confidential nature that is purportedly accessed by Pyramid, the Printer, or Sentry. The fact of the matter is that the only information received by the Sentry system is information pertaining to the cash-out ticket printed by the Printer. As POM concedes, the cash amount of the payout a POM Game operator owes to the consumer is printed on the face of the ticket by the Printer. Compl. ¶¶ 15-16. This information is inherently, and by definition, not confidential. The operator knows how much cash is dispensed and the customer knows the cash payout value. There is nothing that prevents a customer from sharing what is on this ticket with any other parties. Moreover, the Sentry system involves the scanning of a ticket, which has already been printed. The Sentry system does not – and cannot – access information that is not otherwise being sent to the Printer itself.

*Fourth*, in the alternative, if the Court decides that this lawsuit involves claims relating to confidential information, a characterization with which Pyramid vigorously disagrees, POM has instituted the action in the wrong jurisdiction ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ and this Court should dismiss or transfer the lawsuit for improper venue and dismiss Counts II and III for improperly relying on common law of the state of Pennsylvania, rather than Georgia.

Notably, POM has brought this case under federal question jurisdiction based on Count I's CFAA claim. Compl. ¶ 3. If at any time the Court determines that it lacks subject matter jurisdiction over the CFAA cause of action, the Court therefore lacks subject matter jurisdiction

over the remaining claims. *See* Compl. ¶ 4 (explaining that the state law claims are premised on supplemental jurisdiction). Under 28 U.S.C. § 1367(c), the Court must decline supplemental jurisdiction when all claims over which it has original jurisdiction have been dismissed. *See Pen-Del Mortg. Assocs. v. F.D.I.C.*, No. CIV. A. 94-0067, 1995 WL 27516, at *1 (E.D. Pa. Jan. 20, 1995) (noting that courts in the Eastern District of Pennsylvania "ordinarily decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed") (citations omitted). Therefore, if the Court dismisses POM's CFAA claim, as it should, then the Court should also dismiss the other claims here, including the Pennsylvania state law claims, as exercising supplemental jurisdiction over these claims would be improper.

For the reasons above, and based on the arguments below, the Court should dismiss POM's entire Complaint with prejudice.

**A.    POM Lacks Standing Because It Was Not Injured, and Therefore, POM's Claims Must Be Dismissed.**

Because POM was not injured by Pyramid's conduct, as alleged in the Complaint, POM lacks standing to pursue this action. Accordingly, the Court must dismiss the case in its entirety.

**1.    Federal Rule of Civil Procedure 12(b)(1)**

A federal district court is a court of limited jurisdiction that has an independent obligation to inquire into whether it has subject matter jurisdiction to preside over a case. *Finello v. Foster Wheeler LLC*, No. 18-CV-3584, 2023 WL 5002850, at *2 (E.D. Pa., Aug. 4, 2023) (Younge, J.). A Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) challenges the existence of a federal court's subject matter jurisdiction. Pursuant to Federal Rule of Civil Procedure 12(h)(3), "if the court determines at any time that it lacks subject matter jurisdiction, the Court *must* dismiss the action." (Emphasis added).

Article III's "case-or-controversy requirement" requires a plaintiff to "establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (cleaned up). The "irreducible constitutional minimum of standing consists of three elements": (1) "an injury in fact," (2) "that is fairly traceable to the challenged conduct of the defendant," and (3) that "is

likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up). POM, as the party invoking federal jurisdiction, has the burden of establishing standing. *Id*.

When "a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Id*. (cleaned up). Moreover, in deciding a Rule 12(b)(1) motion, the court may consider materials beyond the pleadings when there is a factual challenge to subject matter jurisdiction. *See Finello*, 2023 WL 5002850, at *2. In a factual challenge, such as this, no presumption of truth attaches to POM's allegations. *Id.* Similarly, the Court is not required to convert a motion to dismiss for lack of subject matter jurisdiction into a motion for summary judgment merely because the court considers evidence outside the complaint. *Id.* (citing *Medina v. City of Philadelphia*, 219 F. App'x 169, 172 (3d Cir. 2007)).

> **2.      POM has alleged harm in a conclusory manner that is belied by the clear security benefits conferred by use of the Printer and Sentry.**

The Supreme Court has clearly directed: "No concrete harm, no standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021). "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 427. Because POM has not suffered concrete harm, this case must be dismissed because POM lacks standing.

POM argues that Pyramid violated the federal CFAA, the state Spyware Act, and the common law regarding misappropriation and misuse of confidential business information. Nowhere in the Complaint does Pyramid explain how it was harmed by Pyramid's purported violations.[2]

---

[2] POM also makes vague and conclusory allegations about a non-party, the Tuna Group. Compl. ¶¶ 36-38. But, POM concedes that any data sent to the Tuna Group is 'unknown," and the relationship between Pyramid and the Tuna Group is similarly "unknown." *Id.* There is no clear allegation as to the Tuna Group's role in this litigation and any harm inflicted upon POM by the Tuna Group. Therefore, any assertion of harm is not sufficiently concrete under *TransUnion* and fails to meet the test of plausibility under Rule 12(b)(6).

### a.      CFAA Claims

With regard to the CFAA, POM alleges in a conclusory fashion that it "has suffered damage and loss" because of putative CFAA violations. Compl. ¶ 47. POM asserts that its damages, somewhere above $5,000 or $150,000, *see* Compl. ¶ 47; Designation Form (ECF No. 1-2) at 1, arise from "harm to POM's data, loss of sales of POM-approved TRT, and costs of investigation and remediation[.]" *Id.* None of these categories of purported damage comprise "concrete harm" under *TransUnion*. "Concrete harm" is an injury that is "real, not abstract." *Spokeo*, 578 U.S. at 340. None of the harms alleged are sufficiently "concrete" to withstand scrutiny.

### (i)      Alleged Harm to POM's Data.

POM and its data were not harmed. *Contra* Compl. ¶ 47. As alleged in the Complaint, the POM Game transmits data to a Printer, which prints the information on a ticket. The Sentry scans the publicly-available information on the ticket to assist the owner of the location where the POM Game unit is used in authenticating the ticket. POM has not explained (and cannot explain) how this causes injury to POM.

A recently-decided case from another Eastern District of Pennsylvania court is instructive. *See In Re BPS Direct LLC & Cabela's LLC Wiretapping*, No. 22-CV-4709, 2023 WL 8458245 (E.D. Pa. Dec. 5, 2023) ("*Cabela's*"). In *Cabela's*, a group of consumers brought allegations that retailers' websites were inappropriately tracking the consumers' data. Among other claims, the consumers alleged that this tracking system violated the CFAA by accessing their computers and causing damage. The *Cabela's* court granted a motion to dismiss on standing grounds because website users could not demonstrate that any sensitive data, such as health information or bank records, were actually accessed or disclosed, and therefore, did not suffer "concrete harm" sufficient to establish Article III standing. *Id.* at * 1. Similarly, POM fails to demonstrate that any of its data was sensitive, and if so, whether this sensitive data was actually accessed or disclosed. POM has not made this necessary showing that it was concretely harmed by any alleged loss of data, and accordingly, it lacks standing to pursue the CFAA claim.

-10-

POM has also failed to explain how it suffers any injury if Sentry "pairs" with Pyramid's Printer to produce a second QR code on a ticket. *See* Compl. ¶¶ 28-29. If anything, the additional code assists with the authentication of a ticket prior to a game operator paying out the cash prize to a customer, and the amount of the payout is available on the face of the ticket itself. Contrary to POM's conclusory assertions, common sense dictates that this added layer of security actually helps protect data and promotes the POM Game to gaming establishment operators by ensuring that tickets for winnings are authentic. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). (a court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts").

### (ii)    Alleged Loss of Sales of POM-Approved TRT.

There is also no "loss of sales of POM-approved TRT." *Contra* Compl. ¶ 47. This category of damage is spurious because the Complaint does not allege that either POM and Pyramid make or somehow profit from TRT machines. POM has not identified (i) how sales of TRT machines are affected at all by the use of Sentry and (ii) how any effect on the sales of TRT machines affects POM because POM does not manufacture TRT machines purportedly authorized for use with the POM Game. *See* Compl. ¶ 18. To the extent that POM alleges the use of a non-POM-approved TRT machine causes it harm, POM has sued the wrong party. Gaming establishment operators, not Pyramid, determine whether an establishment uses a TRT. Pyramid does not manufacture TRT machines. Pyramid provides a solution for operators looking to authenticate printed tickets to ensure that these printed tickets are valid before the operators pay out cash prizes.

Indeed, POM alleges that owners/operators of the locations where POM Game units are used are in violation of their individual contracts with POM. Compl. ¶ 22. Pyramid is not a party to these contracts, if they exist. To the extent this lawsuit is about one or more non-party's purported violations, not those of Pyramid, the case must be dismissed on that basis alone.

### (iii)    Alleged Costs of Investigation and Remediation.

Pyramid is not responsible for any costs of investigation and remediation for a simple reason: There is nothing to investigate or remediate. *Contra* Compl. ¶ 47. The Printer works as intended. As explained above, POM surely vetted the Printer and understood how it worked before deciding to the integrate the Printer as a component in its games. Nevertheless, POM contends that it now needs to investigate (i) whether the Printer installed in the POM Game unit to print tickets does, in fact, print tickets and (ii) whether third-party gaming establishment operators, not Pyramid, use Sentry to validate these printed tickets. Costs of remediation are also not appropriate because, as indicated above, POM has not adequately alleged harm, so there is nothing to remediate.

In sum, POM lacks standing to assert its claims under the CFAA.

### b.    Spyware Act Claims

POM alleges statutory damages of $100,000 for "each violation" of the Spyware Act, Compl. ¶ 69(b). POM does nothing else in Count III to elaborate this reference to harm with respect to "each violation" of the statute and cannot point to a "concrete harm" it suffered for these purported statutory violations. Under the clear rule of *TransUnion*, a statutory violation by itself cannot establish Article III standing. *Id* at 442. A "concrete harm" is needed. *Id*. Accordingly, POM lacks standing to pursue Count III.

### c.    Claims Regarding Misappropriation and Misuse of Confidential Business Information

POM further avers, again in abstract and conclusory fashion, that Pyramid's alleged violation of federal common law caused POM to suffer "economic harm, as well as damage to its business in Pennsylvania that is immediate and irreparable." Compl. ¶ 57. POM offers no additional details that help explain what its vague reference to "economic harm" means. But, ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Moreover, as is also explained above, the interoperability of the Printer and Sentry, a module which enhances ticket security, added to the marketability and appeal of the POM Game because it provides operators with confidence that the tickets being

printed are valid and should be paid out.

**B.      POM's CFAA Claims Must be Dismissed Because the Allegations Fail to Satisfy the CFAA's Requisite Elements.**

Even if POM has standing to pursue its claims, which it does not, the Court should still dismiss Count I. POM fails to state a claim under the CFAA (Count I) because the statute's required elements are not met. Under the CFAA, Pyramid accessing the data in question must have been "unauthorized." But POM has failed to allege, as it must, that it had the power to authorize such access, or that POM was the sole source of such authorization. In fact, another party, such as the owner/operator of the POM Game unit's location, could conceivably have authorized the access in order to facilitate in-store transactions and prevent forged tickets. Moreover, the CFAA requires that POM allege that Pyramid intended to defraud POM. But nowhere in the Complaint does POM do so, because it cannot. As explained above, because POM premised this lawsuit on federal question jurisdiction under Count I, if the Court rejects Count I, then the Court must also dismiss the entire Complaint.

**1.      Federal Rule of Civil Procedure 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) requires the dismissal of claims that fail to state a cause of action. Moreover, Rule 12(b)(6) requires dismissal when a plaintiff fails to plead facts that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 12(b)(6). When "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" or support only an "obvious alternative explanation" for the alleged harm, the claims should be dismissed. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations omitted).

Pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Tatis v. Allied Interstate*, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (cleaned up). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

-13-

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost*, 1 F.3d at 183. Thus, this Court must examine POM's claims to assess their plausibility, and the Court cannot accept mere possibility or conjecture.

### 2. Key Statutory Definitions of the CFAA.

POM has alleged that Pyramid violated two provisions of the CFAA. Specifically, these provisions are 18 U.S.C. § 1030(a)(2) (intentionally accessing a computer without authorization or in excess of authorized access that obtains information from a "protected computer") and § 1030(a)(4) ("knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value"). Both provisions require a threshold showing that a "computer" was accessed without authorization" or in excess of authorized access. In other words, the CFAA "imposes liability on one who acts beyond the scope of her access authority." *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 668 (E.D. Pa. 2018).

As relevant here, a "protected computer" is a "computer" that "is used in or affecting interstate or foreign commerce or communication," and a computer is "protected" if it is connected to the internet. *Teva*, 291 F. Supp. 3d at 668 (citing § 1030(e)(2)(B)). Thus, to fall within CFAA's ambit, a device must both touch interstate or foreign commerce or communication, in addition to being connected to the internet, As discussed below, POM has failed to meet this initial hurdle and its CFAA claims must be dismissed on this basis alone.

The CFAA does not define "authorized", nor does the statute clarify the phrase "without authorization." *Id.* at 668. The CFAA defines "exceeds authorized access" as accessing "a computer with authorization [using] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." § 1030(e)(6). Courts within the E.D. Pa. have adopted a narrow approach regarding the intent required to violate the CFAA, namely that if an individual had the authorization to access a computer, then the subjective intent of that

-14-

person is irrelevant. *Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No. CV 16-2499, 2017 WL 1105648, at *15 (E.D. Pa., Mar. 24, 2017) (collecting cases).

Notably, this Court must interpret any ambiguity in the CFAA in Pyramid's favor because of the rule of lenity. Fundamentally, the CFAA is a criminal statute designed to combat hacking. *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 590 (E.D. Pa. 2016). As a criminal statute, CFAA is subject to the rule of lenity, which requires a court to construe ambiguous criminal statutes narrowly in defendants' favor. *Brett Senior & Assocs., P.C. v. Fitzgerald*, No. CIV.A. 06-1412, 2007 WL 2043377, at *4 (E.D. Pa. July 13, 2007). The rule of lenity applies to the construction of a statute in a civil setting if, as is the case with the CFAA, the statute has criminal applications. *Id.* (applying the rule of lenity). Therefore, the rule of lenity mandates that any ambiguity in the CFAA's terms or applications must be interpreted in favor of Pyramid.

### 3.    POM Has Failed to Show That the POM Game Is a "Protected Computer."

As a threshold matter, POM's allegations under the CFAA fail because the POM Game is not a protected computer. POM's CFAA theories rely on the POM Game being a "protected computer." *See* Compl. ¶ 44; *see also* § 1030(a)(2) (requiring information be obtained from a "protected computer"); § 1030(a)(4) (requiring accessing a "protected computer"). POM argues that the POM Game is a "protected computer" because the game includes components from other states, and because POM and its parent company, both based in Georgia, will receive profits from the game's use in Pennsylvania. Compl. ¶ 44. But the definition of "protected computer" requires more. *See Advantage Ambulance Group, Inc. v. Lugo*, 2009 WL 839085, *2 (E.D. Pa. 2009) (allegation "computer so accessed was used in interstate commerce" insufficient since "mere reiteration of the elements of a claim—without more—is insufficient to survive a motion to dismiss.").

Courts, including the Eastern District of Pennsylvania, widely agree that "protected computer" means a computer connected to the internet.[3] *See Teva*, 291 F. Supp. 3d at 668 (citing

---

[3] The statute's alternative definition of "protected computer" as a computer that is "exclusively for the use of a financial institution or the United States Government" is not at issue in this case. § 1030(e)(2).

§ 1030(e)(2)(B)); *United States v. Yücel*, 97 F. Supp. 3d 413, 419 (S.D.N.Y. 2015) (collecting cases); *Gap Properties, LLC v. Cairo*, No. CV1920117KMESK, 2021 WL 5757410, at *3 (D.N.J. Dec. 3, 2021) "[A]llegation that the Computers maintained an internet connection and are in interstate commerce is sufficient to plausibly plead that the Computers are "protected computers" within the meaning of the CFAA."). [4]

By contrast, POM fails to allege that the POM Game is connected to the internet. Therefore, the game is not a "protected computer" as defined by the statute. The Court must reject POM's proposed definition of "protected computer," which relies solely and improperly on interstate aspects of the POM Game's manufacture and business. Compl. ¶ 44. To do so would unlawfully expand the definition of "protected computer" under the CFAA to all computers because computers generally involve many different parts sourced from across state lines.

### 4.     There Was No "Access" Here.

There was no "access" to a computer here. Assuming for the sake of discussion that the POM Game is a "protected computer," POM erroneously alleges that Pyramid accesses the POM Game's cash-out data via the Sentry module. *See* Compl. ¶¶ 45-46. This is incorrect. As

---

[4] *See also National City Bank, N.A. v. Prime Lending, Inc*., 2010 WL 2854247, at *4 n.2 (E.D. Wash. July 19, 2010) (stating that "any computer connected to the internet is a protected computer");  *U.S. v. Drew*, 259 F.R.D. 449, 458 (C.D. Cal. 2009) ("where contact is made between an individual's computer and an Internet website, [interstate communication] is per se established"); *Simmonds Equipment, LLC v. GGR Intern., Inc*., 126 F. Supp. 3d 855, 863 (S.D. Tex. 2015) ("[p]leading specific facts that the defendant accessed a computer connected to the internet is sufficient …"); *Merritt Hawkins & Associates, LLC v. Gresham*, 948 F. Supp. 2d 671, 674 (N.D. Tex. 2013) (same); *Becker v. Toca*, 2008 WL 4443050, *5 (E.D. La. 2008) (same); *Grisafi v. Sony Elecs. Inc*., No. 18-8494 (JMV) (JBC), 2019 WL 1930756, at *7 (D.N.J. Apr. 30, 2019) (concluding that a computer connected to, and used to access, the Internet is a "protected computer" under the CFAA); *United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007) (same); *United States v. Roque*, No. 12-540, 2013 WL 2474686, at *2 (D.N.J. June 6, 2013) (same); *Multiven, Inc. v. Cisco Systems, Inc*., 2010 WL 2889262, at *3 (N.D.Cal. July 20, 2010) (same); *United States v. Fowler*, No. 8:10-CR-65-T-24AEP, 2010 WL 4269618, at *2 (M.D. Fla. Oct. 25, 2010), *aff'd*, 445 F. App'x 298 (11th Cir. 2011) (same); *Paradigm Alliance, Inc. v. Celeritas Technologies, LLC*, 248 F.R.D. 598, 602 (D. Kan. 2008); (same).

explained above, the fact that a consumer has won a prize and the amount of that cash prize are fundamental aspects of the POM Game. That information is sent to the Printer so that a printed ticket with the amount of the prize can be generated. The Sentry module can "pair" with a Printer, and once paired, the Printer will print supplemental information so that Sentry (and consequently, gaming establishment operators) can validate the printed tickets. Thus, the computer in question is not being "accessed" for purposes of the statute. There is no invasive activity occurring, but instead the use of information that the POM Game already sends to the Printer. The POM Game tells the Printer to print a ticket, and cash-out information is printed on the face of the ticket itself. In this regard, the Printer is integral to the overall functioning of the POM Game.

### 5.    Even If "Access" Occurred, It Was Authorized.

The CFAA requires "the access to the computers to be unauthorized by whoever controlled such access." *Oce N. Am., Inc. v. MCS Servs., Inc*., 748 F. Supp. 2d 481, 487 (D. Md. 2010). But Pyramid's "access" to the payout information on the POM Game, if such access occurred, was authorized by the operators of the locations where the game units were used.

As explained above, the Printer is a component of the POM Game unit, and POM and its parent coordinated with Pyramid regarding use and integration of the Printer into the POM Game unit. As part of its extensive coordination with POM and is parent, Pyramid discussed Sentry-enabled firmware on the POM Game units. Moreover, operators of the POM Games use Sentry with the POM Game, as well as possibly other game devices. *See* Compl. ¶¶ 21-22. The operator, therefore, has authorized the use of Sentry with the operator's own POM Game(s). This benefits the operator, as well as POM, by allowing quick validation of printed tickets prior to paying out a cash prize.

For purposes of the CFAA, courts have widely agreed that authorization for "access" derives from owners or other persons with requisite authority over "protected computers," such as lessees. *Oce*, 748 F. Supp. 2d at 487; *see also United Fed'n of Churches, LLC v. Johnson*, 598 F. Supp. 3d 1084, 1095 (W.D. Wash. 2022) ("If the computer owner has not affirmatively

rescinded the defendant's right to access the computer, any existing authorization/permission remains.") (citation omitted); *AtPac, Inc. v. Aptitude Solutions, Inc.*, No. CIV. 2:10294, 2010 WL 1779901, at \*6 (E.D. Cal. April 29, 2010) (holding no civil liability under CFAA where plaintiff did "not allege the sort of subterfuge this court believes is necessary to find a defendant not party to a license agreement civilly liable … where the licensee grants it authority to access information in violation of the license agreement."); *SecureInfo Corp. v. Telos Corp.*, 387 F.Supp.2d 593, 609 (E.D.Va. 2005) (holding that "under [licensee's] grant of authority to the defendants, they were entitled to obtain the information on the server" under CFAA even when that the licensee was in breach of their license agreement). This is consistent with POM's related claim under the Spyware Act, which, as discussed below, explicitly grants owners or lessees the ability to authorize computer access. 73 P.S. § 2330.2.

The District of Maryland's *Oce* case is instructive. In that case, with respect to the CFAA, the federal court noted that "most of the laptops and printers alleged to have been accessed belonged to [defendant] or its employees" and that plaintiff had not alleged "the owners of the laptops and printers, or other person with the requisite authority, denied access such that Defendants' access was unauthorized or in excess of its authorization." 748 F. Supp. 2d at 487. Thus, the authority to provide authorization to access protected computers under the CFAA may come from owners or other parties with "requisite authority."

Nowhere in the Complaint does POM claim to own the POM Games, nor does the Complaint explain how POM otherwise has authority with respect to granting access to the devices. POM does not allege that the owners/operators of the locations POM Game where units are used lack the ability to authorize the use of Sentry. In reality, these operators choose to use Sentry as a tool in fighting against fraudulent game tickets. Whether the gaming establishment operators are owners, lessees, or licensees of the POM Game units is of no moment; POM attempts to argue that it alone can authorize the use of a machine that validates tickets for non-fraudulent payment and fails to argue that the operators of these establishment cannot do so.

-18-

Because POM fails to allege that the operators of the POM Game units rescinded access to the game units, any "access" (if it occurred) was authorized and therefore lawful under the CFAA.

Moreover, with respect to § 1030(a)(4), the Eastern District of Pennsylvania considers this provision as similar to the intentional tort of trespass. *Brett Senior & Assocs., P.C. v. Fitzgerald*, No. CIV.A. 06-1412, 2007 WL 2043377, at *3 (E.D. Pa. July 13, 2007). In *Fitzgerald*, the Eastern District of Pennsylvania concluded that the provision required both a trespass and an intent to defraud and held that a person cannot be liable under that provision when they had lawful access to the information. *Id.* Here, Pyramid's receipt of payout data (assuming this is even equivalent to access of a computer or information), was lawful.

At bottom, the Complaint fails to establish that POM held sole, let alone any, authority over access to the POM Games. Thus, POM's CFAA claims should be rejected.

### 6.    POM's CFAA Theories Fail Because POM Has Not Suffered Damages.

POM's CFAA claim under § 1030(a)(4) requires a loss of at least $5,000 in a one-year period. As discussed above, POM has not suffered any damages or losses. POM has not, in fact, been harmed in any way. Therefore, POM's claim cannot survive.

In conclusory fashion, POM asserts that it "has suffered damage and loss" as a result of Pyramid's alleged violations of the CFAA. Compl. ¶ 47. The CFAA has statutory definitions of "damage" and "loss." The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." § 1030(e)(8). POM has no impairment of any kind to the integrity or availability of its data or other information, and therefore, has not suffered "damage" as it is defined under the CFAA. The CFAA defines "loss" as "any reasonable cost to any victim," such as costs of responding to an offense or costs incurred as a result of interruption of service. As explained elsewhere in this section, POM's theory is unreasonable because any purported access was authorized and has not appropriately alleged the existence of a "protected computer." Because the CFAA's definition of "loss" requires costs to be "reasonable," POM has not suffered a "loss" under the terms of the statute.

Because POM has not suffered damages of at least $5,000, the Court should reject its CFAA claim under § 1030(a)(4).

### 7. POM's CFAA Theories Fail Because the CFAA Does Not Address the Activity Alleged.

Even if the Court accepted POM's theories, which it should not, POM's CFAA cause of action is fatally deficient because it fundamentally distorts what the CFAA is meant to address. With its CFAA allegations, POM seeks to enjoin the "copying, downloading, using, selling and/or disseminating any confidential business information." Compl. ¶ 52. Put differently, POM seeks to punish the alleged *misuse* of information, not its mere access. But that is not what the CFAA is intended to do.

The Supreme Court recently clarified that the CFAA's § 1030(a)(2) provision does not cover persons who are "obtaining information that is otherwise available to them." *Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021). Under such circumstances, CFAA claims have been dismissed even when those persons had improper motives. *Id*. In *Van Buren*, a police officer misused his access to a license plate database. *Id*. The officer had access to the database, but he abused this access in violation of the police department's policy. *Id.* The Court concluded that the CFAA's § 1030(a)(2) provision does not extend when a person is otherwise able to access the information at issue.

Similarly, here, the Printer must necessarily be provided with cash-out information because the Printer must print the ticket. In fact, the information, including, but not limited to, the fact a customer won a cash prize and the amount of the payout, are publicly-available because a ticket was printed and the amount of the cash prize is readily available on the face of the ticket. *See* Compl. ¶ 15. The Printer, as well as the POM Game, needs this information provided to the Printer to generate prize tickets, a foundational aspect of this skill game. The fact that the Sentry module might print additional information, such as a QR code, *see* Compl. ¶ 27, on a written ticket does not mean that the Printer or Sentry are engaged in "accessing" any part of the POM Game or any more information than what was already authorized and necessary for

the successful operation of the POM Game itself. *See P.C. Yonkers, Inc. v. Celebrations The Party & Seasonal Superstore, LLC*, 428 F.3d 504, 509 (3d Cir. 2005) ("That information was taken does not flow logically from mere access.").

Even in the context of other business torts, courts treat the misuse of data under the CFAA differently than the mere access of such data. In *Teva*, the Eastern District of Pennsylvania court stressed that one who "misuses information she was authorized to obtain cannot be held liable." *Teva*, 291 F. Supp. 3d at 670; *see also id.* ("The statute, read plainly, does not ensnare a person who was authorized to obtain information in the computer, but was not authorized to use it the way she did."). In *Teva*, the court dismissed claims against an employee who was authorized to access the company's computers when she did so, when the claims were premised on subsequent misuse of that information. *Id.* at 671. A different Eastern District of Pennsylvania court went even farther when it concluded that the CFAA was not applicable when defendants accessed their work laptops and downloaded thousands of documents to external storage devices for the purpose of competing against the plaintiff. *Dresser-Rand Co. v. Jones*, 957 F. Supp. 2d 610, 620 (E.D. Pa. 2013). That court held that if the individuals "were authorized to access their work laptops and to download files from them, they cannot be liable under the CFAA even if they subsequently misused those documents[.]" *Id.*; *see also id.* at 615 ("Whatever happens to the data subsequent to being taken from the computers subsequently is not encompassed in the purview of the CFAA").

In the present suit, the POM Game necessarily provided the information at issue—the POM Game payout data—to the Printer or otherwise authorized and made the data available to the Printer. To the extent that POM premises its case on the misuse of data, that misuse is not actionable under the CFAA because access to that data was already authorized.

**C.    POM's Pennsylvania State Claims Are Deficient and Should Be Dismissed.**

    **1.    The Spyware Act Claim (Count III) Fails Because It Does Not Apply to the Facts as Alleged in the Complaint.**

The Spyware Act's text and legislative history make clear that it has no relevance to the present allegations. As clearly indicated by its name, the statute was intended to target spyware. As such, Count III should be dismissed.

    **a.    As Its Name Suggests, the Spyware Act Is Intended to Address Spyware.**

It is unambiguous that the Spyware Act is a consumer-focused statute that addresses spyware, defined by the statute as software the user does not authorize. As an obvious clue to this, the statute's name is the "Consumer Protection Against Computer Spyware Act." 73 P.S. § 2330, *et seq.*

The Complaint alleges that Pyramid violated Spyware Act provisions under 73 P.S. § 2330.3(3) and (5). Under these provisions, the Spyware Act prohibits persons who are not "authorized users" who act with "conscious avoidance of actual knowledge or willfully" from causing "computer software to be copied or procure the copying onto the computer of an authorized user in this Commonwealth" and use that software to perform certain enumerated deceptive actions or "any other acts deemed to be deceptive." 73 P.S. § 2330.3. These deceptive acts include (but are not limited to) actions that spyware programs might undertake, such as blocking the installation of software or rendering security software inoperable. *Id*. Furthermore, under the Spyware Act's text, only entities that are not "authorized users" can violate 73 P.S. § 2330.3. In turn, the statute defines an "authorized user" as "a person who owns or is authorized by the owner or lessee to use" a specified computer." 73 P.S. § 2330.2.

Unsurprisingly given the statute's name, the Pennsylvania Senate Appropriations Committee Fiscal Note describes the bill's purpose as "providing for the protection of consumers from having spyware deceptively installed on their computers and for criminal and civil

-22-

enforcement."[5] The Pennsylvania House Appropriations Committee similarly noted that the bill "prohibits the transmission and use of computer spyware."[6]

### b. Pyramid Did Not Copy Computer Software on to A Computer, So the Spyware Act is Inapplicable.

POM's cited provisions of the Spyware Act require certain statutory elements. Specifically, under 73 P.S. § 2330.3, an alleged violator must (i) cause computer software to be copied or procure that copying onto a computer in Pennsylvania and (ii) then perform one or more acts deemed to be deceptive. POM has focused entirely on the second prong, *See* Compl. ¶ 65. But, POM does not allege that Pyramid copied software or procured the copying of software onto the POM Game. *See* 73 P.S. § 2330.3. Because POM has failed to make this threshold pleading, the Spyware Act claims must be dismissed on this basis alone.

### c. Because Neither the Printer Nor Sentry Are Spyware, Count III Must Be Dismissed

The Spyware Act prohibits "copying" of software or copying of software onto a computer in order to "remove, disable or render inoperative security, antispyware or antivirus software installed on the computer." 73 P.S. §§ 2330.3(3), (5). Nowhere in its Complaint does POM allege that these activities occurred, because they did not.

Even if the Spyware Act does apply to the circumstances alleged in the Complaint, the Spyware Act defines "authorized user" as a "person who owns or is authorized by the owner or lessee to use the computer." Here, the operators of the locations where POM Game units are used, whether they are owners or lessees of the units, installed the Sentry module for purposes of ticket verification. Moreover, the Printer is an authorized and integrated component in the POM Game unit that necessarily uses gaming information to generate prize tickets for winning users. Thus, Pyramid was, and remains, an "authorized user," as defined by the Spyware Act. 73 P.S. §

---

[5] Pennsylvania Senate Appropriations Committee Fiscal Note, S.B. 123 (Mar. 31, 2009), https://www.legis.state.pa.us/WU01/LI/BI/SFN/2009/0/SB0123P0096.pdf.
[6] Pennsylvania House Committee on Appropriations, S.B. 123 (Sept. 29, 2010), https://www.legis.state.pa.us/WU01/LI/BI/FN/2009/0/SB0123P0884.pdf.

2330.2 (defining an "authorized user" as " a person who owns or is authorized by the owner or lessee to use the computer").

Moreover, a required element of a Spyware Act violation is a "deceptive act," but there is nothing deceptive about the use of Sentry to prevent ticket forgery. POM cites the Spyware Act's definition of "deception, Compl. ¶ 65 (quoting 73 P.S. § 2330.2), as including, but not limited to, making intentional false statements, intentional misrepresentation, and intentional omissions regarding the downloading of software. But, POM has failed to articulate how Pyramid's efforts to deter fraud somehow amount to "deception" under the Spyware Act. In fact, Sentry's entire purpose was to prevent deceptive activity (namely, ticket fraud). Because this threadbare recitation of the statute's provisions does not plausibly state a claim, the court should dismiss the claim.

> **2.  POM's Pennsylvania State Law Claim Regarding Misappropriation and Misuse of Confidential Information (Count II) Similarly Fails.**

POM's common law misappropriation of confidential information claim is unavailing for the same reasons discussed above.

Under Pennsylvania common law, misappropriation of confidential information is actionable under the tort of procuring information by improper means. *See Teva*, 291 F. Supp. 3d at 680. In this tort, when a competitor "for the purpose of advancing a rival business interest, procures by improper means information about another's business[, it] is liable to the other for the harm caused by its possession, disclosure or use of the information." *Id.* at 680-81 (citation omitted). Therefore, the three primary elements of this tort are (1) obtaining *confidential* information; (2) by *improper* means; and (iii) causing *harm* to the rival business.

There is nothing confidential about the payment information recorded on the Sentry module and the Complaint does not include specific allegations as to what information Pyramid had allegedly accessed. Anyone observing the games would have seen the payment information at issue. The Printer prints a ticket with the payment information clearly visible on its face. The information on the printed ticket is similar to a ticket to a sporting event that records who is

playing, the venue, and where the ticket was printed, among other information. The operators of the POM Game necessarily need this information to verify winning tickets so that payment may be safely provided.

POM alleges that the payout data on the printed ticket is "kept in strictest confidence by POM." Compl. ¶ 54. That allegation makes no sense. The payout data is printed on the face of the ticket. Operators of the POM Games must necessarily know this information in order to pay cash prizes that result from playing the game. Players of the POM Game who win a prize must necessarily know this information because game operators hand the players cash prizes.

Similarly, Pyramid has not acted improperly. The Printer prints tickets for winners of the POM Game, and the game operator can use the Sentry module to authenticate these printed tickets prior to paying out a cash prize. Pyramid's efforts are intended to address fraud, such as duplicate or fraudulent tickets.

Also, POM did not suffer any harm. In fact, POM, by its own admission, alleges that it has not yet suffered any harm under the purported misappropriation of its confidential information. In its Complaint, POM alleges that it "will" suffer economic harm. Compl. ¶ 57. POM does not explain why it has not yet suffered any harm, nor does it explain how the harm will occur. This is the type of threadbare conclusory assertion that cannot withstand the exacting pleading requirements under Federal Rule of Civil Procedure 12(b)(6). *See Iqbal*, 556 U.S. at 678.

Therefore, the Court must dismiss POM's state law claim for misappropriation of confidential information.

**D.**  ███████████████████████████████████████████████
███████████████████████████████

    **1.**  ██████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████

-26-



-27-



-28-







## IV.    Conclusion

For the foregoing reasons, Pyramid respectfully requests that this Court grant its Motion and dismiss all of POM's claims against Pyramid with prejudice.


[Signature Page Follows]

Respectfully submitted,                                Dated:  January 9, 2024

**DILWORTH PAXSON LLP**                                **PERKINS COIE LLP**


Timothy J. Ford, Attorney ID: 325290                   By: */s/ Barak Cohen*
tford@dilworthlaw.com                                  Barak Cohen, Admitted *pro hac vice*
1500 Market Street, Suite 3500E                        BCohen@perkinscoie.com
Philadelphia, PA 19102                                 700 Thirteenth Street, N.W., Suite 800
Telephone: +1.215.575.7017                             Washington, D.C. 20005-3960
Facsimile: +1.215.575.7200                             Telephone: +1.202.654.6200
                                                       Facsimile:  +1.202.654.6211

                                                       */s/ Thomas J. Tobin*
                                                       Thomas J. Tobin, Admitted *pro hac vice*
                                                       TTobin@perkinscoie.com
                                                       1201 Third Avenue, Suite 4900
                                                       Seattle, Washington 98101-3099
                                                       Telephone: +1.206.359.8000
                                                       Facsimile:  +1.206.359.9000

# CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a true and correct copy of the foregoing was served upon the following via Electronic Filing System (CM/ECF) on the date specified below:

*Via CM/ECF:*

Matthew H. Haverstick
Kleinbard LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
215-568-2000
Fax: 215-568-0140
Email: mhaverstick@kleinbard.com

Date: January 9, 2024

/s/*Barak Cohen*
Barak Cohen